UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

MICHAEL JONES,

*Defendant.*

**MEMORANDUM & ORDER**
24-cr-00235 (NCM)

**NATASHA C. MERLE**, United States District Judge:

Defendant Michael Jones is charged with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF. No. 15. Before the Court is Mr. Jones's motion to suppress statements he made to New York Police Department ("NYPD") officers on April 23, 2024, at the 81st Precinct. Mot. 2–3, ECF No. 58.[1] It is undisputed that Mr. Jones received, and waived, his *Miranda* rights before proceeding to make incriminating statements. Mot. 3–4. Mr. Jones maintains, however, that his waiver was invalid because he was highly intoxicated at the time. Mot. 3–4. But intoxication is only one factor to be considered when deciding whether a *Miranda* waiver is voluntary. And because the totality of the circumstances indicate that—intoxication notwithstanding—Mr. Jones's waiver was in fact knowing and voluntary, there is no basis upon which to suppress his statements.

For the reasons discussed in more detail below, Mr. Jones's motion is **DENIED**.

[1] The Court hereinafter refers to defendant's Motion to Suppress, ECF No. 58, as the "Motion"; the government's Memorandum of Law in Opposition to defendant's Motion to Suppress, ECF No. 61, as the "Opposition"; and defendant's Reply Memorandum in Further Support of Motion to Suppress, ECF No. 65, as the "Reply." Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

## BACKGROUND

On April 25, 2024, the government filed a Complaint alleging that Jones, having previously been convicted of a felony, knowingly possessed firearm ammunition. *See* Compl. 1, ECF No. 1. The Complaint alleges that on April 13, 2024, NYPD officers were alerted to a shot fired near 554 Madison Street, Brooklyn, New York. Compl. ¶ 2. Officers recovered a 9mm bullet shell casing from the location and identified a "Black man wearing light pants and a dark jacket firing a gun into the air" from surveillance footage taken around the time of the incident. Compl. ¶ 2. According to additional footage, this individual's jacket contained a "Chicago Bulls insignia on the chest and light-colored patches on the sleeves." Compl. ¶ 3. Officers included images from this footage in a Wanted Flyer, No. 91790579, which was later used to identify Jones. *See* Compl. ¶¶ 3–4.

On April 23, 2024, Jones encountered Officer Sanjeev Kissoondyal while walking out of the NYPD 81st Precinct. Suppression Hr'g Tr. ("Tr.") 22:1–23:3, ECF No. 86.[2] Officer Kissoondyal recognized Jones from the Wanted Flyer, Tr. 23:18–21, and from having observed Jones on several prior occasions.[3] When Officer Kissoondyal saw Jones, he was "pacing back and forth in front of the precinct." Tr. 22:6–13. Officer Kissoondyal "confronted" Jones, telling him "I know you're here to do the right thing." Tr. 22:6–13. At that point, Jones walked back into the precinct with Officer Kissoondyal, where Officer

---

[2] Although defendant says that he turned himself in at night, testimony at the suppression hearing confirmed that he turned himself in the morning of April 23, 2024. Tr. 79:1–3 (Question: "[Y]ou just testified that you actually turned yourself in to police the morning of April 23rd, right?" Answer: "Yes.").

[3] There is some question regarding the number of times Officer Kissoondyal had previously observed Jones. Tr. 43:19–44:13. For present purposes, the Court concludes that regardless of how many times Officer Kissoondyal previously observed Jones, it is likely that Jones would have been recognizable based on the Wanted Flyer, in which he was wearing the same "distinctive Chicago Bulls jacket" as he was wearing the day of the arrest. Tr. 27:8–11; *see* Tr. 23:20–21; *see generally* Opp'n Ex. A ("Interview Footage").

Kissoondyal proceeded to collect Jones's pedigree information and conduct a search of Jones's person. Tr. 24:6–25:22.[4] This process took approximately five minutes. Tr. 25:23–25. Officer Kissoondyal was at most two feet away from Jones during this time, Tr. 26:1–4, 28:16, and during the search, Officer Kissoodyal described himself as "basically on top of" Jones, Tr. 26:5–6, 28:17–21.

After being processed, Jones was first placed in the precinct's holding area and then brought to an interview room. Tr. 26:10, 84:7–13. The entirety of Jones's time in the interview is captured on video. *See* Opp'n Ex. A ("Interview Footage"). After confirming Jones's name, address, and phone number, Detective David Paray reads Jones his *Miranda* rights. Interview Footage 21:00–22:04. Mr. Jones responds "yes" each time he is asked if he understands each of his rights, and answers "yes" when asked if he would like to speak to the detective. Interview Footage 21:31–22:04. Jones proceeds to identify himself as the person firing the weapon in the video, which he claims is an "airsoft paintball gun." Interview Footage 31:00–50.

On June 5, 2024, a grand jury returned an indictment charging Jones with one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). *See* Indictment ¶ 1.

On February 27, 2026, Jones filed a motion to suppress the statements he made to law enforcement, arguing that he waived his *Miranda* rights involuntarily because he was highly intoxicated at the time. Mot. 3–4. The government opposed, arguing that Jones was "in no way intoxicated" and that the totality of circumstances demonstrated that Jones's waiver was knowing and voluntary. Opp'n 5–7. The government also pointed to

---

4 Pedigree information includes a person's "name, date of birth, [address], and the [physical] condition that the [person is] in at that time. Tr. 24:24–25:2.

other pieces of evidence from the interview that, in its view, fall outside the scope of *Miranda*, arguing that these should be admitted even if the Court were to grant Jones's motion to suppress. Opp'n 8–9. Jones replied, disputing for the first time the "admissibility of other items of evidence relating to the interview," such as the fact that he presented himself to the precinct and identified himself, and the evidence about the clothing he was wearing at the time. Reply 4. Jones also attached a declaration describing his history with alcoholism and his drinking behavior immediately prior to turning himself in. Reply Ex. A, ECF No. 65-1.

After reviewing the parties' submissions, the Court concluded that an evidentiary hearing was required to assess the totality of the circumstances surrounding Jones's *Miranda* waiver. *See* ECF Order dated June 11, 2026.[5]

## DISCUSSION

Defendant moves to suppress statements he made to officers at the 81st Precinct for one reason—he was so intoxicated at the time that he was unable to appreciate the rights he was waiving or the consequences of his waiver. Mot. 3.[6] Because he has suffered

---

[5] The evidence presented at the suppression hearing is incorporated as relevant to the discussion below.

[6] At the suppression hearing, defendant clarified that he seeks to suppress two additional categories of information. First, he seeks to suppress certain information that was collected when he entered the precinct, such as his biographical information (name, address, and telephone number), and the fact that he walked into the precinct, identified himself, and said he was there to turn himself in, Reply 4; Tr. 8:1–11:3. Defendant claims *Miranda* should apply to these statements because the police already suspected he was the person who had discharged the firearm. Tr. 10:3–11:4. Because the location of the alleged discharge, as well as defendant's address and identity were the subject of law enforcement interest at the time, defendant argues that the officers should have known that his answers to questions about his identity and address—less than a tenth of a mile from the location of the alleged discharge—would have been likely to elicit an incriminating response. Tr. 8:17–9:16, 10:3–11:4. This argument is unavailing because "*Miranda*'s warning requirements apply only to custodial interrogation," *United States*

from alcoholism for years and drank heavily the day before he turned himself in, and because he cannot remember the details of his interaction with police that morning, defendant argues that he "lacked the capacity for conscious choice" and his *Miranda* waiver was therefore invalid. Reply 3 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)).

The government, relying on video footage of defendant's interview, argues first that defendant was not intoxicated, his *Miranda* waiver was knowing and voluntary, and his motion should be denied on that basis alone. Opp'n 5–6. But even accepting that defendant was intoxicated, that fact does not change the analysis in the government's view. Opp'n 6–7. That is because "[a] person of [defendant's] age, education, and criminal

---

*v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004), and defendant was not in custody at the time he made those initial statements, *see id.* ("[I]t makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end."). Although Officer Kissoondyal's comment that he knew defendant was at the precinct "to do the right thing," Tr. 22:12–13, somewhat undermines the government's assertion in its briefing that defendant simply "appeared at the local police precinct to turn himself in," Opp'n 2, it does not suggest that a reasonable person in defendant's position would have felt he lacked the ability to leave. *See White v. Keane*, No. 95-cv-10754, 1996 WL 527340, at *1 (S.D.N.Y. Sept. 16, 1996) ("Here the petitioner voluntarily accompanied the police officer to the station, never indicated that he wanted to leave and was allowed to go unescorted to the bathroom. Petitioner has failed to establish conduct by the detectives amounting to the kind of pressure that would cause a reasonable person to feel that he had no choice but to submit."). Moreover, "pedigree questions that pertain to administration or a defendant's basic identification information do not trigger *Miranda*." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017).

Second, defendant seeks to suppress the booking photographs that were taken after his interview. Reply 4–5; Tr. 11:10–12:3. Defendant's argument on this point appears to be that the photographs, taken after the allegedly invalid *Miranda* waiver, should be suppressed under the exclusionary rule. Because the Court concludes that defendant's *Miranda* waiver was in fact valid this argument fails. For that same reason, there is no basis for defendant's suggestion that the still frames taken from the Interview Footage should be suppressed. *See* Tr. 11:10–12:3.

history is likely to understand a basic *Miranda* warning and to be able voluntarily to waive his rights—intoxicated or not." Opp'n 7.

After careful consideration of the totality of the circumstances, the Court concludes that, although defendant was likely intoxicated at the time, his *Miranda* waiver was voluntary. Therefore, none of the statements he made to officers on April 24, 2026, warrant suppression.

**Legal Standard**

"In *Miranda v. Arizona*, the Supreme Court acknowledged that the in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "It is well settled that *Miranda* requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, *inter alia,* of their right to remain silent and to have an attorney present during questioning." *Id.* at 155.

*Miranda*'s warning requirements, however, apply only to "custodial interrogation." *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. at 444). A person is in custody for purposes of *Miranda* if "a reasonable person in [that person's] position would have understood [the]mself to be subjected to the restraints comparable to those associated with a formal arrest." *Id.* at 671; *see id.* at 675 ("*Miranda*'s focus is on the facts known to the seized suspect and whether a reasonable person would have understood that his situation was comparable to a formal arrest."). An interrogation includes "any words or actions that are likely to have the force of a question on the accused and [would] therefore be reasonably likely to elicit an

incriminating response." *United States v. Carr*, 63 F. Supp. 3d 226, 237 (E.D.N.Y. 2014); *see also United States v. Broughton*, 600 F. App'x 780, 783 ("[I]nterrogation can take the form of express questioning or its functional equivalent, which includes words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). In assessing whether the police "should have known" that their actions were reasonably likely to elicit an incriminating response, courts consider "the totality of the circumstances." *Broughton*, 600 F. App'x at 783 (quoting *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009)).

That said, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and, thus, do not require preliminary advice of rights." *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007) (quoting *Miranda*, 384 U.S. at 478). Where a defendant has alleged police custodial interrogation in the absence of *Miranda* warnings, "the burden shifts to the government to prove *Miranda* voluntariness[.]" *United States v. Northover*, No. 25-cr-0087, 2026 WL 1179599, at *5 (S.D.N.Y. Apr. 30, 2026).

A person may waive their *Miranda* rights. However, the prosecution must establish that such a waiver was "knowingly and voluntarily" made. *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). A *Miranda* waiver is knowing if made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is voluntary if it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Moran*, 475 U.S. at 421). The prosecution has the burden to establish the validity of a *Miranda* waiver

by a preponderance of the evidence. *United States v. Burger*, 739 F.2d 805, 809 (2d Cir. 1984).

The Court must examine the "totality of the circumstances surrounding the interrogation" to determine whether a *Miranda* waiver was both knowing and voluntary. *Moran*, 475 U.S. at 421. These circumstances include "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023) (quoting *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)). A confession is not voluntary if "obtained under circumstances that overbear the defendant's will at the time it is given." *Mendonca*, 88 F.4th at 163–64. Thus, a defendant's intoxication level is one of the circumstances the Court should consider in determining the voluntariness of a *Miranda* waiver. *Siciliano Nuñez v. McCarthy*, 718 F. Supp. 3d 209, 220 (E.D.N.Y. 2024).

**Application**

Defendant argues that, given his history of alcoholism and voluminous consumption of alcohol in the days and hours leading up to his conversation with Det. Paray, his *Miranda* waiver was neither knowing nor voluntary. Mot. 3; Reply 2–3; *see* Tr. 140:3–141: 10. The government maintains—somewhat incredibly—that defendant was not intoxicated at the time of the interview. Opp'n 5–6; *see* Tr. 133:13–134:8 (arguing that defendant was "sobering up, at least a little bit" between 8:30 a.m., when he entered the precinct, and approximately 10:30 a.m. when the interview began, after drinking all day and all night before, and noting that defendant "only . . . [drank] one additional drink that morning"). Perhaps sensing the implausible nature of its topline argument, the government contends that, even if defendant was intoxicated, he nonetheless knowingly and voluntarily waived his rights. Opp'n 6–7; Tr. 134:12–14 ("I don't want to be repetitive.

The video speaks for itself. He's able to understand [the *Miranda*] questions even if he had been drinking.").

As a threshold matter, the Court finds it more likely than not that defendant was intoxicated at the time he waived his *Miranda* rights. Defendant testified that there are several people in his family that have issues with drinking too much alcohol. Tr. 59:6–13. He said that these family members "drink[] all day." Tr. 59:7–25. It is therefore as unsurprising as it is unfortunate that defendant began drinking at age eleven. Tr. 60:1–15. From ages eleven to sixteen, defendant drank "two to three days a week," until he became incarcerated. Tr. 60:11–22. Although defendant stopped drinking while incarcerated and for a period of time after he was released, he began drinking socially again in 2021. Tr. 61:4–10. By 2024, however, defendant's drinking had escalated to the point that he would "wake up drinking and go to sleep drinking" every day of the week. Tr. 62:22–63:9.

Based on defendant's testimony it is difficult to imagine that he is ever both awake and entirely sober.[7] Defendant testified that each day, he wakes up around 8:00 a.m. and—if his roommate is still asleep—"sneak[s] in the [roommate's] bar and pour[s] [] a cup of liquor," before heading outside to "wait for the liquor store to open up at 10:00 a.m." Tr. 63: 10–15; *see* Tr. 63:24. At that point, he "buy[s] a bottle" and waits for his friends to come outside, Tr. 63:15–16, at which point they put their money together to "get another bottle." Tr. 63:16–17. "[A]s soon as th[at] bottle runs out," defendant and his friends "get another bottle." Tr. 63:18. This routine "continues into the night" until "11:00

7 Although certain aspects of defendant's testimony regarding the timeline of events leading up to his interview with Det. Paray were not fully consistent with his declaration, Tr. 78:14–22, the Court largely credits defendant's testimony regarding his own alcohol use.

p.m. [or] 12:00 a.m." when defendant and his friends are "getting ready to go to the club." Tr. 64:5–15. Once at the club, defendant and his friends "just dr[i]nk all night." Tr. 65:15–18. Defendant never drinks wine, beer, or mixed drinks; he only drinks straight liquor. Tr. 65:24–66:4.

And defendant testified that on April 22, 2024, the day before he turned himself in, he did not deviate from this "routine." Tr. 66:20–67:9. Accordingly, defendant drank from morning until night, went to the club and continued to drink "until it closed," and thereafter "linger[ed] outside the club" and continued to drink. Tr. 67:4–15. Notably, he "didn't eat" anything at the club. Tr. 68:8–12. Eventually, he headed home, where his roommate told him that the police had been looking for him for an alleged incident of domestic violence. Tr. 68:13–22. Defendant's roommate was not happy that the police had visited his house, and the two began to argue. Tr. 68:25–69:3. Frustrated, defendant "poured some liquor in a cup and left and went to [his] girlfriend's house." Tr. 69:6–7.[8] Once defendant arrived at his girlfriend's apartment he was not allowed to enter. Tr. 70:22–71:10. From there he proceeded to the precinct. Tr. 71:11–12.

Because defendant drank practically nonstop from 8 a.m. on April 22, 2024, until approximately 7 a.m. the morning he turned himself in, the Court concludes that it is more likely than not that he was intoxicated to some degree at the time he waived his *Miranda* rights.

But the fact that defendant was intoxicated at the time of the waiver is not the end of the matter. That is because "a defendant's intoxication is only one circumstance the

---

8 Defendant testified that in his previous experiences being booked for domestic violence offenses, he would turn himself in but have to wait for 12 to 15 hours before receiving a lawyer, and that he would drink heavily before turning himself in so that he could sleep during those 12 to 15 hours. Tr. 69:11–70:21.

court must consider." *Siciliano Nuñez*, 718 F. Supp. 3d at 220 (E.D.N.Y. 2024). Indeed, "an intoxicated defendant may waive his or her *Miranda* rights so long as he or she appreciated the nature of the waiver." *Id.*; *see United States v. DiLorenzo*, No. 94-cr-00303, 1995 WL 366377, at *8 (S.D.N.Y. June 19, 1995) (collecting cases and observing that "a claim that a defendant was . . . suffering from the effects of alcohol is not, in the absence of coercive law enforcement activity, sufficient to characterize his confession as involuntary").

The totality of circumstances indicates that defendant appreciated the nature of his waiver. As previously stated, these circumstances include (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Mendonca*, 88 F.4th at 164.

First, defendant's age and background suggest he would have had a general adult-level understanding of the NYPD and the warnings Det. Paray provided. Defendant was 28 years old at that time of the interview. Opp'n Ex. C ("Pretrial Services Report") 2, ECF No. 63-2. For 26 of those years, defendant has lived in New York City. *Id.* He is a native English speaker, earned his GED, and, at least prior to his arrest, held long-term employment as a fire safety guard. *Id.* Even accepting defendant's testimony that he had never before received a *Miranda* warning, Tr. 85:21–86:15, these factors suggest that defendant had the requisite level of competence to understand the *Miranda* warnings that Det. Paray read to him.

Second, intoxication does not work like a light switch. Defendant's long-term abuse of alcohol—and testimony at the suppression hearing—suggests that he has built up a tolerance to its effects. Accordingly, the mere fact that defendant had been drinking heavily the day before the interview with Det. Paray cannot be analyzed in a vacuum. And

several pieces of evidence suggest that, at the time of the interview, defendant was not intoxicated to the degree that he "lack[ed] capacity for conscious choice." Reply 3 (citing *Taylor*, 745 F.3d at 24).[9]

Defendant's behavior during other interactions with police suggests that his intoxication operates on a spectrum. Since his arrest, defendant has violated his pretrial conditions of release several times. *See* Opp'n Ex. B, ECF No. 63-1. These incidents, in which defendant was reportedly intoxicated, reveal that in at least some instances his level of intoxication results in violence and disorderly conduct. *See id.* at 2 ("It should be noted

---

[9] The Court notes that it finds Det. Kissoondyal's testimony that despite being "basically on top of" defendant while searching him, Tr. 26:6, 28:21–22, he detected "no odor of alcohol at all," Tr. 31:7, difficult to believe in light of defendant's account of his daily drinking routine, Tr. 63:7–66:8, and Det. Kissoondyal's own admission that defendant was known as "the town drunk," Tr. 49:8–10. Nonetheless, this case is distinguishable from *United States v. Cellemme*, in which the court granted a motion to suppress because it had "serious doubts regarding the credibility of the government's version" of events. 431 F. Supp. 731, 734 (D. Mass. 1977). There, the defendant, who witnesses described as "a poor drinker" and "not hav[ing] much drinking capacity" was arrested less than an hour after a wedding reception at which those same witnesses observed him drinking heavily. *Id.* at 733–34. The court found it "curious" that the "[arresting] officers detected no odor of alcohol on the defendant's breath," "troubl[ing]" that despite the defendant's allegedly immediate agreement to cooperate, "it still took approximately two hours to obtain a signed confession consisting of only one and a half typed pages," and "puzzl[ing] [] the contention that the defendant waited approximately one and a half hours after making a confession to call anyone." *Id.* at 734. The court concluded that "while perhaps none of these factors would independently establish that the defendant was so intoxicated as to be incapable of voluntarily confessing, they are sufficient to raise serious doubts regarding the credibility of the government's version" of events. *Id.* Here, there is no testimony that defendant is a poor drinker; quite the opposite. Tr. 101:12–17 (Question: "Was he the type of person who would slur his word[s] or stumble around? Answer: "No. Michael could still walk around and get around pretty good." Question: "Was he the type of person who'd be falling over? Answer: "No, not at all."). Nor, as discussed below, is there evidence of coercion. And although the Court reiterates its skepticism of Det. Kissoondyal's "curious" testimony regarding the lack of smell of alcohol on defendant, *see Cellemme*, 431 F. Supp. at 734, this fact, in light of the other evidence suggesting that defendant was able to "appreciate the nature of [his] waiver," *Bruno v. Cunningham*, No. 03-cv-00937, 2004 WL 2290503, at *10 (S.D.N.Y. Oct. 8, 2004) (quoting *Alvarez v. Keane*, 92 F. Supp. 137, 150 (E.D.N.Y. 2000), does not meaningfully change the Court's analysis.

that the police report indicated the defendant was intoxicated at the scene and acted in a violent manner toward police."); *id.* at 3 ("The report indicates that [defendant] was highly uncooperative with [the NYPD]; was intoxicated and refused to walk. It was noted that four members of service were needed to carry [] defendant into the station house."). In contrast, his behavior during the interview—calmly and appropriately answering Det. Paray's questions and being overall cooperative—at the very least suggests that he was not at the height of intoxication at the time. *See*, *e.g.*, Interview Footage 22:04–44, 24:15–35.

And the interview video footage supports the inference that defendant's level of intoxication was at the lower end of his spectrum. In the video, defendant appears to be coherent and responsive. *See generally* Interview Footage. He reviews video footage with Det. Paray, seemingly able to follow what the video is showing. Interview Footage 23:00–29:41, 30:50–31:40; *see id.* 31:30–35 ("I was on the phone, obviously I was on the phone . . . with my cousin"). He notes that the video is "dark," *id.* 23:11–15, and asks what time of day it is showing, *id.* 23:20–23:25. At one point, defendant identifies the bodega in the video as one from which he frequently buys "cigarettes [and] beers." *Id.* 24:15–24:28.[10] Perhaps most tellingly, once presented with evidence that he was caught on video discharging the firearm in question, defendant formulates a story about how it was not a real gun but rather an "airsoft paintball" gun that "take[s] the CO2 cartridges." *Id.* 31:00–49. And although he answers several questions throughout the interview, at no point does defendant slur his words or appear otherwise intoxicated. Put differently, he "seemed to understand what was going on." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003); *see People v. Parsad*, 243 A.D.2d 510, 512 (2d Cir. 1997) ("Although the defendant had been

[10] Det. Paray's question "you a big drinker," Interview Footage 24:28–35, to which defendant responds in the negative, appears to have been precipitated by this statement, as opposed to any outward signs of intoxication.

drinking alcohol when the officers initially approached him . . . [he] was able to walk and articulate appropriate responses to the detectives' questions."). Finally, the video shows defendant sit and stand with no apparent difficulty. Interview Footage 17:30–39, 36:55–37:17, 37:30–40. The stability with which he accomplishes these maneuvers suggests that defendant's motor skills were not overly affected by his level of intoxication at the time.[11]

In sum, even considering the fact that defendant has "an issue with alcohol," Tr. 148:15–16, and that he was likely somewhat intoxicated when he walked into the 81st Precinct, the evidence does not suggest that he was so intoxicated that he failed to appreciate the nature of his actions.

The remaining analysis requires little discussion. As depicted on the video footage, neither the "the conditions of interrogation" nor "the conduct of law enforcement officials," *Mendonca*, 88 F.4th at 164, suggest that Det. Paray "took undue advantage of [defendant]'s diminished mental state, and ultimately overbore his will." *Taylor*, 745 F.3d at 25.

The interview was conducted in a conversational tone, and Det. Paray, who was the only officer present, never raised his voice or otherwise appeared threatening. *See, e.g.*, Interview Footage 33:00–34:33. Further, "[t]he interview itself was not unduly lengthy," *Haak*, 884 F.3d at 415, as it lasted under twenty minutes, Interview Footage 20:57–37:50; *cf. United States ex rel. Burns v. LaVallee*, 436 F.2d 1352, 1355–56 (2d Cir.1970) (finding

---

[11] Defendant's citation to *United States v. Cope* for the proposition that experienced drinkers "cannot have tolerance to the cognitive effects" of alcohol is unavailing, primarily because that case involved an expert witness who was opining on a pilot's ability to safely operate a commercial airplane. 676 F.3d 1219, 1223, 1228–29 (10th Cir. 2012). While the Court agrees that, as a general matter, experienced drinkers may be able to mask the physical effects of their overconsumption such that they appear to be functioning at a higher cognitive level than they actually are, it does not follow that cognitive function for purposes of flying a plane is in any way analogous to cognitive function for purposes of a *Miranda* waiver.

a written confession to be involuntary when given "after over eighteen hours of uninterrupted custodial interrogation, after [the defendant] had been without sleep, and almost without food, for thirty hours."). Defendant was not handcuffed during the interview, and was provided cigarettes upon request. Defendant does not allege that Det. Paray or any other officer engaged in manipulation, coercion, or intimidation. Simply, it would be difficult to imagine a more "routine, benign, and noncoercive investigatory scenario." *Haak*, 884 F.3d at 415.

Given the characteristics of the defendant, including his history of alcoholism, the conditions of the interrogation, and the conduct of Det. Paray, the totality of the circumstances establishes that defendant's *Miranda* waiver was voluntary and thus valid. Accordingly, it would be inappropriate for this Court to suppress the statements he made after that waiver.

**CONCLUSION**

For the foregoing reasons, defendant's motion to suppress is **DENIED**.

**SO ORDERED.**

*/s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated: September 4, 2026
Brooklyn, New York